## TEXAS FARM BUREAU COTTON ASS'N v. STOVALL.  (No. 8957.) *

(Court of Civil Appeals of Texas. Dallas.
Feb. 10, 1923. Rehearing Denied
March 17, 1923.)

**1. Agriculture ☞6—Contracts ☞10(4)— Agreement between cotton grower and co-operative marketing association unenforceable for want of mutuality and consideration.**

A contract between a farm bureau association incorporated under and by authority of Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k–14½yy, to promote the co-operative production and marketing of cotton, obligating the grower of cotton for a period of five years to sell to the association all cotton grown by him within the state of Texas, to be resold by the association with cotton produced by other growers, but not binding the association to sell such cotton at any definite time nor to any particular person nor in any definite manner, nor upon terms, prices, or conditions capable of being fixed or determined, and containing other provisions binding the grower but not imposing any reciprocal burden or duty upon the association, *held* unilateral, without mutuality, and without consideration.

**2. Sales ☞1(4)—Contract not fixing price nor means to determine price void for indefiniteness.**

A sale contract is not invalid because no price is fixed if it provides a method for ascertaining the price with certainty, but a contract not providing a price nor fixing any way in which it may be ascertained leaves it wholly a matter of speculation and is void for indefiniteness.

**3. Agriculture ☞6—Constitutional law ☞154(1)—Statute authorizing co-operative marketing contracts does not validate contracts devoid of mutuality in violation of constitutional inhibition against impairing obligations of contracts.**

Notwithstanding Vernon's Ann. Civ. St. Supp. 1922, art. 14½s, authorizes co-operative farm associations to make marketing contracts with growers, providing that it may sell or resell the products of its members without taking title thereto, does not authorize or make valid contracts between growers and the association which are devoid of mutuality both of obligation and of remedy, as any such construction would render the statute void under both state and federal Constitutions as impairing the obligations of contracts and as being inherently repugnant to justice.

**4. Injunction ☞57—Threatened breach of contract will not be restrained where contract could not be enforced by specific performance.**

That Vernon's Ann. Civ. St. Supp. 1922, art. 14½s, authorizing co-operative marketing associations and contracts between such associations and growers of produce and expressly providing, as does the contract in question, for the remedy of injunction to restrain a grower from selling his produce in violation of his contract, does not authorize injunction where the contract by reason of indefiniteness and want of mutuality could not be enforced by specific performance.

**5. Specific performance ☞6, 32(1)—Not available to enforce sale contract lacking mutuality.**

Where a contract between a grower of cotton and a co-operative marketing association was lacking both in mutuality of obligation and mutuality of remedy, specific performance will not be decreed to compel the grower to sell his cotton to the association.

**6. Specific performance ☞75—Not available to enforce contract not capable of present performance where constant and indefinite supervision by court would be required.**

Notwithstanding Vernon's Ann. Civ. St. Supp. 1922, art. 14½s, provides that a co-operative marketing association shall be entitled to specific performance of contracts between it and produce growers for the sale of their produce only to such marketing association, under the settled rule in equity that specific performance will not be decreed where a contract is not capable of present performance but the performance of which would require constant supervision by the court covering a long period and involving a series of acts, such a marketing contract requiring the grower for a period of five years to sell only to the association all cotton grown by him at any place within the state of Texas will not be enforced by a decree of specific performance.

Appeal from District Court, Ellis County; W. L. Harding, Judge.

Suit for injunction and specific performance by the Texas Farm Bureau Cotton Association against J. C. Stovall. From a judgment denying a temporary restraining order and dismissing the petition, the complainant appeals. Affirmed.

Birkhead & Lang, of San Antonio, and Milton Sapiro and Aaron Sapiro, both of San Francisco, Cal., J. C. Lumpkins, of Waxahachie, and C. K. Bullard and Elkeridge, McCormick & Bromberg, all of Dallas, for appellant.

W. P. Hancock and Farrar & Kemble, all of Waxahachie, and John H. Sharp, of Ennis, for appellee.

HAMILTON, J. Appellant, a nonprofit association and without capital stock, incorporated under and by authority of articles 14½k to 14½yy, inclusive, Vernon's Texas Civil Statutes, 1922 Supplement, brought this suit against appellee seeking specific performance of a contract and agreement between the parties alleged to be dated June 24, 1921, and also seeking an injunction against appellee to enjoin and restrain him from making any disposition of cotton grown by him or for him otherwise than by making delivery of all of it to appellant.

It was alleged that the corporate association was organized by cotton growers in Tex-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 11, 1923.

as for the purpose of enabling them to co-operate in handling, grading, storing, marking, and disposing of cotton produced by them, and thereby eliminating waste and minimizing speculation in cotton products; and also for the purpose of gaining for such organizers the benefits of economies and stabilization to be derived from collective and co-operative handling, grading, storing, marketing, and making distribution of cotton.

It was alleged that appellee executed what is called an "association agreement" in writing, which embodied a marketing agreement whereby appellee bound himself to sell to appellant, and appellant agreed to purchase from him, all the cotton produced or acquired by or for him in Texas for a period of five years, to wit, from 1921 to 1925, inclusive, upon the terms and conditions set forth in the agreement. A copy of the alleged agreement was attached to the petition and made a part of it, and it was alleged that the association was organized and incorporated in accordance with the provisions the agreement contained. It was further alleged that the agreement was one of a series identical in terms, all signed by individual growers who were members of the organization, and that the agreements collectively comprised a single contract between the corporation and all of the signatory growers of cotton. It was alleged that the operations of the corporation and the collective marketing were dependent upon the faithful performance of all the agreements made by the different growers of cotton in Texas, and that failure to perform such agreement by the growers, and their failure to sell and deliver cotton covered by it to the corporation, would defeat and destroy the purpose for which the corporation was formed.

Appellant alleged that since it is a co-operative marketing association, handling only the cotton produced by its members, it cannot go into the open market and buy cotton for the purpose of fulfilling its contract of sale which it makes relying upon the performance of marketing agreements. It was alleged that appellee had violated the terms of the contract, had refused to deliver cotton raised by him and for him, and that it was entitled to specific performance as well as to an injunction to restrain appellee from making sale of his cotton or other disposition of it otherwise than to appellant under the provisions of the contract.

Appellee answered appellant's verified petition by setting forth various exceptions and by allegations of facts pleaded in detail and at length. The defense, as alleged, comprehended allegations of fraud, deceit, misrepresentation, incompetence, and failure of performance, on the part of appellant, which, if true, would, in our opinion, constitute defenses against the cause of action alleged.

It is unnecessary to set out the allegations of facts interposed by appellee for the reason that the trial court's judgment is not rested upon a finding of such facts.

The court sustained exceptions interposed by appellee substantially as follows: (1) That the contract pleaded is unilateral; (2) that this contract is uncertain; (3) that it is not a contract of purchase and sale; and (4) that it does not purport to be a contract between appellant and appellee. For these reasons, the trial court held that specific performance by appellee could not be required, and denied the application for a temporary restraining order and dismissed the petition.

The appeal is rested upon the contention that the court was in error in the construction placed upon the contract, and the points advanced are the following: (1) That the agreement is not unilateral; (2) that the agreement is certain and definite and not void for uncertainty; (3) that it is a contract of purchase and sale; and (4) that it is a contract between appellant and appellee.

The contract is voluminous. Its provisions are designed with detailed precision to bind appellee. It is a printed instrument, prepared on behalf of appellant, to be issued in large numbers for the purpose of obtaining the signatures of numerous cotton growers and thus effecting the object sought. A more or less comprehensive statement of its various terms is considered essential in connection with an expression of the view of this case which we entertain.

It is introduced with an outline of the purposes to be achieved by and through it. They are recited to be these: The promoting, fostering, and encouraging of the business of co-operatively producing and marketing cotton, reducing speculation, stabilizing cotton markets, co-operatively and collectively handling the problems of cotton growers, "and other pertinent purposes."

The first clause following the declaration of purpose is as follows:

"We will become members of the Texas Farm Bureau Cotton Growers' Co-operative Marketing Association, a nonprofit association without capital stock, to be organized under the laws of the state of Texas."

It provides that the association may include in its membership when organized any cotton growers in Texas, either tenant or landlord, who receive any cotton as rent.

A board of directors is provided for consisting of 23 members, 20 of whom are to be selected from among association members residing in 20 named districts. The other 3 directors are to be selected by the Governor of Texas and the president of A. & M. College and the president of the Texas Farm Bureau Federation; each of these officers naming one of the three. The directors are to exercise their authority primarily as representatives of the general public in conducting the association. Officers and employees are to be selected by the board of directors,

and provision is made for bonding those who handle funds. Each member of the association or corporation is required to pay a $10 entrance fee, except members of the Texas Farm Bureau Federation, who become members without paying such fee. It is provided that when the corporation is organized it shall have suitable articles of incorporation and by-laws. An organization committee is named, and it is provided that if by July 1, 1921, signatures of cotton growers or persons eligible to membership covering at least 1,000,000 bales of cotton of the 1920 crop shall not have been secured for this agreement, the organization committee shall notify the subscribers, whereupon each of them shall have the right to withdraw and cancel the agreement by written notice mailed to the secretary of the organization not later than August 1, 1921. And it is further provided that if all the signatures are not then withdrawn, the organization committee may proceed with the organization and with the marketing plans under the agreement, provided signatures covering at least 500,000 bales remain uncanceled. It is provided that—

"For all matters of production or signatures and for all statements of fact in connection herewith the written statement of the organization committee provided for in paragraph 12 hereof * * * shall be absolutely conclusive with or without notice to the subscriber."

Provision is made for a report by the organization committee named in the contract to be made to the directors of the corporation when it is organized.

The parties contract to the effect that the corporation, to the organization of which this and similar contracts are preliminary, may organize warehousing corporations with certain specified rights and powers, and issue and sell only to members of this particular corporate organization common stock. Preferred stock in such warehouse corporations is authorized; and the sale of it to any person without restriction is provided for. Other details relating to warehouse provisions need not be stated.

Immediately following the above-enumerated provisions in the agreement is a provision to the effect that the subscriber to the undertaking is to execute, when requested by the corporation to be organized, another agreement to the same effect as that embodied in the contract sued upon, or, at the option of the board of directors, is to be bound by the terms of an agreement denominated "Texas Farm Bureau Cotton Growers' Association Marketing Agreement," following all the foregoing in the instrument.

Under this name appellant, reciting itself to be a nonprofit association with its offices at Dallas, Tex., makes a contract as follows (omitting provisions which need not be stated):

(1) The grower becomes a member of the association for the purpose of carrying out its express aims; (2) the association agrees to buy, and the grower agrees to sell and deliver to it, all of the cotton he produces or acquires during the five years from 1921 to 1925, inclusive; (3) he warrants that he has not contracted to sell or deliver any of his cotton to any person except as he may note on a blank line following his signature, such mortgage or lien as he may have placed on his 1921 crop. He binds himself to deliver all his cotton to appellant at the earliest reasonable time after it is ginned, either at a warehouse controlled by appellant or at the nearest public warehouse, or by shipment to appellant as directed by it. It is provided that any deduction or loss that the association may suffer on account of inferior grade or condition, etc., at delivery, shall be charged against the grower, appellee. Appellant is given carte blanche to provide inspectors, graders, and classifiers to standardize, grade, and classify the quality and method and manner of handling, pressing, and shipping the cotton. Provision is made for appellant to pool appellee's cotton with other like grade of cotton, each pool to be for a full season. The association agrees to endeavor to sell the cotton to the spinning industry at the best possible price before another crop is produced, but it is stipulated that should it deem prices unsatisfactory or production greater than consumption, or in case of what is termed abnormal trade or financial conditions, then, in its discretion, it may hold such cotton "as may not be sold at a satisfactory price until there is a fair demand for it."

Appellant agrees to resell the cotton with other cotton of the same kind and grade delivered to it by other growers under similar contracts, at the best price obtainable by it under market conditions, and to pay to appellee the net amount received from the sale, less freight, insurance, and interest, after deducting, within appellant's discretion, the cost of maintaining itself, and also after deducting organization fees and annual membership fees to the Texas Farm Bureau Federation, as well as all costs of handling, grading, and marketing, and also deducting reserves for credits and other general provisions; the reserves to be deducted not to exceed 1 per cent. of the resale price. It is provided that the surplus, after all such deductions from sales of cotton are made, shall be prorated to the growers delivering cotton on the basis of deliveries.

Appellant is given authority to sell the cotton at any place, at any time, to anybody, and in any manner which it may deem profitable, fair, and advantageous to growers. It does not bind itself to sell the cotton at any time which is definite or which can be made definite, nor to any particular person or corporation, nor in any definite manner,

nor upon any terms nor for any price which can be fixed or calculated on the basis of anything of a definite character contained in the contract. The appellee agrees that appellant may borrow money on the cotton in various ways. Appellant agrees to prorate the money it may borrow among the growers in whatever way it may determine to be equitable. The contract binds the grower to comply with all of its provisions so long as he produces cotton, directly or indirectly, or has any right to exercise control of any commercial cotton or any interest in cotton during the term of the contract. It is provided that if appellee mortgages any of his crops during the term of the contract, then appellant shall have the right to pay off such mortgage and take delivery of the cotton for his account and charge such payment against him individually. And he further agrees that if the mortgagee desires him to do so, he will execute in favor of the creditor an assignment of his interest in the cotton "which he has sold, or will sell, to the association for the protection of the creditor to the extent of the creditor's just claim, and the association in turn agrees, upon notice of such assignment, to respect the same and to pay to the creditor to the extent of his just claim the proceeds otherwise due the grower." A provision is inserted declaring the agreement to be one of a series in similar terms, and that all such contracts embody one single contract between appellant and all the growers who execute them.

Appellant is authorized by the terms of the instrument to deliver to any warehouse corporation organized for co-operation with appellant, any or all of his cotton, and to charge against his account the pro rata costs of such services and the pro rata shares of the funds necessary to create a reserve equivalent to one class of its preferred stock, annually, plus a bonus. (This is for the purpose of retiring preferred stock in such warehouse corporation as may be organized.) And he also authorizes appellant to pay interest on advances and dividends on outstanding preferred stock in such warehouse corporation.

It is expressly provided that should appellee fail to sell and deliver all of his cotton under the terms of the contract to appellant, then he shall pay to appellant for all cotton sold, delivered, consigned, withheld, or marketed by or for him otherwise than in accordance with the terms of the agreement, the sum of five cents per pound, middling basis, as liquidated damages for the breach thereof. And it is further provided that in the event of a breach or threatened breach by appellee of any of the provisions regarding delivery of cotton, appellant shall be entitled to an injunction to prevent such breach and to a decree for specific performance, and, in the same connection, it is declared that the contract is one of purchase and sale of personal property under special

circumstances and conditions, and that the buyer cannot go into the open market and buy cotton to replace any which the grower may fail to deliver. Other provisions designed to reinforce the authority of appellant over cotton to be grown by appellee, and to provide for expenses, fees, etc., to be charged by appellant, need not be stated, as their recitation here is not material to an understanding of the construction we place upon the instrument.

[1, 2] The only definite obligations revealed in this contract rest altogether upon appellee. We can discover nothing in its terms when they are subjected to careful analysis, remotely imposing upon appellant any mutuality of burden. Appellant is bound to part with no consideration of any kind or character which would be essential under any view to a contract of purchase and sale. It pays appellee nothing. It gives to appellee not the slightest definite insurance that he will reap a benefit from the transaction. It takes upon itself neither risk nor substantial liability. It assumes no real responsibility. Appellee is compelled to part with all title to cotton which he may raise anywhere in Texas during a period of five years. He is bound to deliver it to appellant at no specific place but at a warehouse or, in the alternative, some point of shipment which appellant may dictate, within a reasonable time after appellee has had it ginned each year. Appellant is to assume exclusive dominion over it, exercising complete ownership until such time as the discretion of its officers may dictate a sale of it. If, and whenever, their decision is that a sale should be made, then, after deducting whatever expenses and penalties which may have been involved in the processes through which it has been passed by appellant, the net proceeds of such sale which may remain are paid to appellee.

Appellant promises no fixed price for the cotton, and the contract supplies no basis upon which any possible definite calculation of it can be rested. What consideration appellees shall receive is involved in the most expansive indefiniteness. It rests in the limbo of pure speculation. Of course, the rule of civil law that there must be a fixed and agreed price as an essential to a contract of sale does not prevail with us. The less rigorous rule is, as contended by appellant, that the price may be left to be fixed in any way in which it may be ascertained with certainty; but this contract is devoid of any element of certainty as to the price which is to be paid appellee by appellant or as to the time of payment.

The nearest approach to an obligation upon appellant disclosed by the terms of the contract is that it will take the title to and possession and control of appellee's property and endeavor through processes generally stated to obtain the best price to be had for

the cotton, and pay over to appellee the proceeds of such sale after making various deductions. The contract suggests no definite idea of what appellant will do to obtain a benefit for appellee. In its final analysis, appellant's undertaking is merely that it will match the judgment and discretion of its managing officers against the uncertainty and fluctuations and various economic problems affecting the sale and consumption of a commodity of world-wide use, and return to appellee whatever profits are derived from the adventure should any profits be achieved. We think it manifest from the terms of the contract that it is unilateral as disclosing no mutuality of obligation and because there is nothing in its terms remotely constituting a consideration for the purchase of appellee's cotton.

Certain terms of the contract, themselves, exclude the idea that a purchase and sale at the time the agreement was entered into was mutually intended. Appellee is repeatedly referred to as the owner. His right to mortgage is recognized and provisions are made for the discharge of mortgages which he may make by appellant paying off the indebtedness which the cotton may secure and taking it over and accounting to appellee for whatever sale of it is made.

[3] The marketing feature of the contract manifestly was made with reference to the provisions of article 14½s of Vernon's Texas Civil Statutes, 1922 Supplement. This article authorizes such organizations as appellant to make marketing contracts providing that it may sell or resell the products of its members with or without taking title thereto. However, we do not understand this statute to declare that an agreement which is without the essential elements of a contract of purchase and sale to be in fact and law such contract. It does not authorize and make valid an agreement which is devoid of real mutuality of obligation as well as of remedy; but, if the statute did attempt to give validity to such a transaction, it would be void and in conflict with both state and federal Constitutions as impairing the obligations of contracts, and as being against the inherent and natural sense of fundamental justice which must underlie dealings between men.

[4] While the order appealed from is merely an interlocutory decree refusing to grant a temporary injunction, and although this remedy is expressly provided for by article 14½s, supra, as well as stipulated in the very terms of the contract, yet such relief could be invoked only in the event the contract were of a nature to which the remedy of specific performance could be applied. Indeed, an injunction to restrain the breach of a contract is but a negative decree of specific enforcement of the contract. "The jurisdiction of equity to grant such injunction is substantially coincident with the jurisdiction to compel specific performance. Both are governed by the same doctrine and rules, and it may be stated as a general proposition that whereever the contract is one of a class which will be affirmatively specifically enforced, a court of equity will restrain its breach by injunction if this is the only practical mode of enforcement which its terms permit." 3 Pomeroy, Equity Jurisprudence, 1341. In other words, to enjoin a party from violating the provisions of his contract is but an indirect and negative mode of compelling specific performance. It is achieving, in effect, the same equitable remedy by a different mode of procedure in equity, governed by the same rules and doctrine. Hence the right to an injunction in this case necessarily depends upon the right to compel specific performance.

[5] From what we have already said, it follows that in our view there can be no specific performance required of appellee in this case because the contract is lacking both in mutuality of obligation and mutuality of remedy; and, as we understand the rule, specific performance will not be required in a case where mutuality is lacking either as to the obligation or as to the remedy. Ordinarily specific performance will not be decreed against one party to a contract when the other party has not performed and specific performance by him cannot, for any reason, be required. Specific performance against appellant could not be invoked because of the very nature of its promises. They require, for compliance on its part, very largely the exercise of judgment and discretion as to what will be done by appellant and as to when it will be done. Specific performance of undertakings involving these elements under the circumstances presented cannot be compelled by a court of equity. Hence, for the reason alone that there is no mutuality of remedy, the contractual provision for specific performance against appellee is invalid and unenforceable. Carrico v. Stevenson (Tex. Civ. App.) 135 S. W. 261; Elliott on Contracts, § 2282, vol. 8, Sup.; Pomeroy's Equity Jurisprudence, § 1405; Williston on Contracts, § 1433; Deitz v. Stephenson, 51 Or. 596, 95 Pac. 803; Chicago Light & Fuel Co. v. Lake, 130 Ill. 42, 22 N. E. 616; Chadwick v. Chadwick, 121 Ala. 580, 25 South. 631.

[6] Although this contract expressly provides that appellant shall have the remedy of specific performance against appellee, yet, it seems to us, the well-settled rule in equity to the effect that specific performance will not be decreed where a contract is not capable of present performance, but the performance of which would require constant supervision by the court covering a long period and involving a series of acts, applies. If specific performance were granted against a tenant farmer, or any farmer, under the provision of this contract, the court in en-

forcing the decree would be confronted with the possible problem of pursuing the party against whom the decree is made from place to place over the cotton producing area of Texas, and inquiring into and supervising the delivery of varying quantities of cotton produced from time to time at different places, as well as subjecting itself to the possibility of continuous inquiry into and supervision of cotton otherwise acquired by such person. Beckham v. Munger Oil & Cotton Co. (Tex. Civ. App.) 185 S. W. 991; Lone Star Salt Co. v. Railway Co., 99 Tex. 434, 90 S. W. 863, 3 L. R. A. (N. S.) 828.

The case of L. D. Hollingsworth et al., appellants, v. Texas Hay Association, appellee, 246 S. W. 1068, recently decided by the Court of Civil Appeals for the First Supreme Judicial District of Texas, is relied upon by appellant as authority controlling this case.

The terms of the contract relied upon in that case are not set out in the opinion and are not before us. We are therefore unable to determine to what extent its terms were similar to those of the contract under consideration. In any event, our view that the trial court properly denied the relief sought, because of the frailties in the contract which we have indicated, is so fixed that we could not abandon it to follow any decision to the contrary unless it proceeded from a tribunal, the decisions of which constitute final authoritative declaration of the law binding upon us.

The contract, being unilateral and uncertain, and being without the necessary elements of a valid contract of sale, the injunction was properly denied.

The judgment is affirmed.

### On Motion for Rehearing.

Appellant's motion for rehearing is accompanied by a copy of the contract in the case of Hollingsworth v. Texas Hay Association, in which case the action of the trial court in granting an injunction against the appellant's delivering hay to any person except the appellee, Texas Hay Association, was affirmed by the Court of Civil Appeals for the First Supreme Judicial District. The contract relied upon by the appellee in that case is substantially the same as the contract relied upon by the appellant in this case. No briefs were filed in that case, but the effect of the decision was to hold the contract to be one of purchase and sale.

Application for a writ of error was made to the Supreme Court and a writ of error was refused. The only ground upon which a writ of error was sought was that the contract was in violation of section 26, art. 1, of the state Constitution. No such question was raised in or remotely involved in the instant case. None of the questions decided or discussed by this court in this case was presented to the Supreme Court in the Hollingsworth Case. This appears from a certified copy of the application for writ of error in the Hollingsworth Case, which application has been filed in this court in answer to the motion for a rehearing.

The excellent argument made in behalf of the motion for a rehearing has not convinced us that our judgment is erroneous. Still being of the opinion that our decision is sound, we are not willing to recede from it without an expression upon it by the Supreme Court. Since our decision is in conflict with the decision of the Court of Civil Appeals for the First Supreme Judicial District, and since the case seems to be one of great public interest which ought to be finally disposed of expeditiously, we have decided to overrule the motion for a rehearing for the reason that we assume a decision by the Supreme Court, will be made at an earlier date upon the writ of error, which will be granted, than if it were presented otherwise to that court.

The statement in the original opinion that appellee is repeatedly referred to in the contract as the owner is erroneous and is to be considered as withdrawn. Nowhere in the contract is appellee expressly termed the "owner."

The effect of our decision is not to nullify the declared policy of the state expressed in the statute authorizing co-operative marketing, as appellant contends it is. Our decision merely holds that the contract is not one of purchase and sale which can be enforced either by injunction or the co-ordinate remedy of specific performance.

Appellant's theory seems to rest exclusively on the idea that the contract is a contract of purchase and sale as distinguished from a contract of agency. It zealously presses upon us the case of Oregon Growers' Co-operative Association v. August Lentz et al., 212 Pac. 811, recently decided by the Supreme Court of Oregon, as conclusively supporting its theory of the contract involved in this case. We do not construe the decision of the Supreme Court of Oregon as treating the contract as one exclusively of the nature of a sales contract. It seems to us that the contract construed by that court was treated rather as one of agency. The court expressly held that Lentz could not be compelled to deliver the products grown by him upon his land. The obligation was construed by the court only to the effect that if he did sell his products after he had grown them, then he was obligated to sell them to appellant, Co-operative Marketing Association; that is, he was bound to dispose of them through the marketing association as an agency of all growers who had entered into the contract, if he sold them at all. That view is quite different from the view advanced by appellant in this case, which is that it is the absolute owner of appellee's cotton, whenever and wherever during the period of years specified in the contract cot-

ton is raised by him. We feel constrained to say, however, that independent of whatever view may be entertained by courts beyond this jurisdiction, we cannot depart from the conclusion we originally arrived at in this case to, the effect that the contract is not one of purchase and sale to be enforced either by injunction or specific performance.

The motion for a rehearing is overruled.